**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEVIN YOUNG,

      Petitioner,                          CASE NO. 05-CV-71480-DT

v.                                   HONORABLE GEORGE CARAM STEEH
                                       UNITED STATES DISTRICT JUDGE

JERI-ANN SHERRY,

      Respondent,

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Kevin Young, ("Petitioner"), presently confined at the Kinross Correctional

Facility in Kincheloe, Michigan, seeks the issuance of a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  In his *pro se* application, petitioner challenges his

conviction for two counts of armed robbery, M.C.L.A. 750.529; possession of a

firearm in the commission of a felony, M.C.L.A. 750.227b; and being a second

felony habitual offender, M.C.L.A. 769.10.  For the reasons stated below, the

petition is **DENIED.**

## I.  Background

Petitioner was convicted of the above charges following a jury trial in the

Wayne County Circuit Court.  Petitioner's convictions arose from the armed

robbery of Fong Yang and Scott Parker in front of Yang's house in Detroit,

Michigan at about 1:30 a.m. on December 7, 2000.

1

Walter McCray, Yang's neighbor, testified that he arrived home at about 1:00 a.m. and looked out of his window and observed a 5'10" or 5'11" Caucasian or light complected African-American man wearing a black jacket and a mask with the eyes and nose cut out pointing a silver gun at Yang and his friend.  After robbing the men, the perpetrator got into the passenger side of a dark, "Oldsmobile kind of car", which was "bluish or black color."

Fong Yang testified that he and Parker arrived at his home from work at approximately 1:30 a.m.  While Parker waited in the car, Yang went to his house to get his car keys.  A man approached him from the street with his right hand up.  The man grabbed him, turned him around, held a silver gun at his back and demanded money.  Yang testified that the man wore a mask with a circular cut in his face and was taller than him.  The perpetrator took Yang to the car and ordered Parker out of the vehicle.  The perpetrator demanded Parker's wallet, took money from it, and threw the wallet to the ground.

Yang testified that he and Parker drove to the police station and told the police that their assailant was an African American, taller than Yang, dressed in black and wearing a ski mask, "with big bulky eyes."  Yang testified that the next day, December 8, 2000, he gave a statement to Investigator William Jackson and was shown two photographs.  Yang identified petitioner as being the robber from one of the photographs.  When asked how he could identify the robber from this photograph in light of the fact that the perpetrator's face was partially covered,

Yang testified that the "eyes and part of the nose" in the photograph looked familiar to him.

Yang testified that he identified petitioner at the preliminary examination as being his assailant because of the photograph and because of the eyes. At the preliminary examination, Yang described the robber as being 5'8" to 5'11" and weighing 170-192 pounds. Yang likewise testified that he identified petitioner at trial because of the photograph as well as petitioner's eyes.

Scott Parker's testimony concerning the robbery mirrored Yang's testimony in most respects. Parker described the robber as an African-American male wearing a mask. Parker testified that the robber wore a black jacket and black pants. Parker testified that the robber was holding a black gun, not a silver gun, as McCray and Yang had testified. Parker stated that the gun that was subsequently recovered by police and shown to him at trial may have been the same as the one used by the robber, although he noted that this gun was not black. Parker was never shown any photographs by the police. Parker stated that he identified petitioner at the preliminary examination because he remembered that the robber's "eyes popped out stuck out." Parker told the police that the robber was a black man with a deep voice, 30 to 35 years older, taller than himself, stocky, and dark complected. At trial, Parker testified that the robber was as tall as him, 6'3". Although Parker acknowledged that it was not too difficult to figure out who the defendant was at the preliminary examination,

3

because petitioner was the only one who was not a lawyer or police officer, he

testified that he identified petitioner as the robber partly because of his "popped

out" eyes, not because he was the only non-lawyer in the courtroom.

Kenneth Leonard, the 911 operator, received a call at about 1:45 a.m. on

December 7, 2000 regarding the robbery.  The caller indicated that the

perpetrator was dressed all in black and was running to a blue Oldsmobile.

Detroit Police Officer Devon Maples testified that he began following a light

blue Oldsmobile after receiving a dispatch informing him of a robbery that had

occurred at Manning and Hamburg Streets in Detroit.  Officer Maples and his

partner stopped the automobile at about 1:50 a.m.  It was stipulated that

petitioner was the owner of this vehicle.  Petitioner was a passenger in the car,

which was being driven by Maurice Christon.  Petitioner was wearing a black

Carhartt coat with a hood, a black hooded sweater, and black pants.  Police

patted down petitioner and recovered a mask from his person.  Both petitioner

and Christon were arrested for outstanding warrants.  Although Maples had a key

and a keypad, he was unable to open the trunk of the Oldsmobile and petitioner

indicated that he could not open the trunk either.  The car was taken to a local

towing company.

Sergeant John Turney of the Detroit Police Robbery Task Force searched

petitioner's car at the tow company lot.  When Tunney could not find a remote

trunk release in the car and could not get the remote control to open the trunk, he

forced it open with a crow bar.  Tunney recovered a loaded .38 caliber revolver in the trunk.  Tunney agreed that no stolen items were found in the car.

Detective Julius Moses testified that he had contact with petitioner on December 7, 2000, after his arrest.  Petitioner was wearing a black Carhartt jacket, a black hooded sweatshirt, black pants, and black shoes.  Petitioner told Moses that he was 5'9" and 185 pounds.

Maurice Christon testified that he picked petitioner up from his job on the evening of December 7, 2000.  The two men went to the State Fair Lounge, where they remained until 1:45 a.m.  When the men left, Christon drove down Hamburg Avenue.  Petitioner asked Christon to stop just beyond Hamburg, because he wanted to visit a woman.  Christon lost sight of petitioner for a few minutes.  When petitioner returned to the cart, he said, "take off, take off, let's go man.. Sort of excited like something went wrong in the house."  Christon testified that petitioner seemed to have a black ski mask in his hands.  They drove to a gas station on Seven Mile Road to put air in a tire.  Christon observed petitioner open the car trunk with a remote control keypad and place a .38 caliber silver gun in the trunk.  Shortly after leaving the gas station, the men were stopped by the police.

Petitioner's conviction was affirmed on appeal. *People v. Young,* No. 239523 (Mich.Ct.App. July 15, 2003); *lv. den.* 469 Mich. 1000; 675 N.W. 2d 596 (2004).  Additional facts will be discussed when addressing petitioner's claims.

Petitioner now seeks the issuance of a writ of habeas corpus on the following

grounds:

> I. The trial court's denial of Petitioner's motion to suppress the
> suggestive in-court identification was clearly erroneous because
> there was an insufficient independent basis where complainant Yang
> could not identify Mr. Young the day after the robbery and even after
> telling the police that he could not identify his assailant he was
> shown just two photographs of two suspects, one of whom was Mr.
> Young.
>
> II. Where the perpetrator's identity was the primary issue at trial, Mr.
> Young's state and federal due process rights were violated where
> police failed to preserve crucial evidence that denied him access to
> potentially exculpatory information.
>
> III. The circuit judge committed reversible error when he refused to
> instruct as requested by Petitioner Young that because of the police
> failure to preserve the automobile the automobile should be
> considered favorable to the defense.

## II.  Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review for habeas
cases:
> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim–
>
>> (1)     resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly
>> established Federal law, as determined by the
>> Supreme Court of the United States; or
>> (2)     resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the
>> evidence presented in the State court proceeding.

 A decision of a state court is "contrary to" clearly established federal law if

6

the state court arrives at a conclusion opposite to that reached by the Supreme

Court on a question of law or if the state court decides a case differently than the

Supreme Court has on a set of materially indistinguishable facts. *Williams v.*

*Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs

when "a state court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may

not "issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly." *Id.* at 410-11.

### III. Discussion

**A. Claim # 1. The in-court identification claim.**

Petitioner first claims that the trial court erred when it denied his request to

suppress Yang's in court identification of Petitioner because it was the result of

an improper photographic show-up which involved only two photographs.

Following a *Wade* [1] hearing, the trial court found that Yang had been subjected

to an unduly suggestive photographic show-up, but that there was a sufficient

independent basis upon which Yang could make an in-court identification of

petitioner as his assailant.

In reviewing the trial court's decision, the Michigan Court of Appeals found

that there was an independent basis for Yang's in-court identification of

---

[1] *United States v. Wade,* 388 U.S. 218 (1967).

petitioner.  In so ruling, the Michigan Court of Appeals utilized the following eight

factors that the Michigan Supreme Court had indicated in *People v. Gray,* 457

Mich. 107, 116; 577 N.W. 2d 92 (1998) and *People v. Kachar,* 400 Mich. 78, 96-

97; 252 N.W. 2d 807 (1977) should be used to determine whether an

independent basis for an in-court identification exists. *People v. Young,* Slip. Op.

at * 1-2.

In rejecting petitioner's claim, the Michigan Court of Appeals ruled that the

trial court's finding that Yang had an opportunity to observe petitioner during the

robbery was supported by Yang's testimony at the *Wade* hearing that the area

where the robbery occurred was well lit, that the robber stood less than a foot

away from him, and that, in spite of the mask worn by the robber, Yang could

see the perpetrator's eyes and nose.  The Michigan Court of Appeals agreed

with the trial court that the time between the robbery and the identification of

petitioner as the robber was short enough to favor a finding that there was an

independent basis for identification, in light of the fact that the robbery occurred

on December 7, 2000, Yang identified petitioner at the photographic show-up on

December 8, 2000, and the preliminary examination was conducted on

December 21, 2000.  The Michigan Court of Appeals further ruled that the trial

court's finding that Yang's description of the robber generally matched

petitioner's description in terms of height, weight, and clothing was supported by

the fact that Yang described the robber as African-American, 5'8" to 5'11" tall,

weighing between 170 and 180 pounds, and wearing a black work jacket, and black clothes, while petitioner was described as African-American, 5'9" tall, weighing 185 pounds, and wearing a black jacket, a black hooded sweatshirt, black pants and black shoes when he was arrested.  The trial court next found that Yang, while tired, was not suffering from fatigue or under the influence of alcohol or drugs such as would prevent him from making accurate observations of the robber.  The Michigan Court of Appeals concluded that the remaining factors used to determine the validity of a witness' in-court identification did not undermine the trial court's decision.  Although Yang had no prior knowledge of petitioner, that was only one factor.  Although Yang first stated that he would not be able to identify the robber, he made that statement before being shown the photographs, and before observing petitioner.  Finally, Yang never identified anyone else as the robber.  Given that most of the *Kachar* factors favored finding an independent basis for an in-court identification of petitioner, the Michigan Court of Appeals concluded that it could not say the trial court erred in ruling that such an independent basis existed for the in-court identification. *People v. Young,* Slip. Op. at * 2.

Due process protects the accused against the introduction of evidence which results from an unreliable identification obtained through unnecessarily suggestive procedures. *Moore v. Illinois*, 434 U.S. 220, 227 (1977).  To determine whether an identification procedure violates due process, courts look

first to whether the procedure was impermissibly suggestive; if so, courts then

determine whether, under the totality of circumstances, the suggestiveness has

led to a substantial likelihood of an irreparable misidentification. *Kado v. Adams*,

971 F. Supp. 1143, 1147-48 (E.D. Mich. 1997)(citing to *Neil v. Biggers*, 409 U.S.

188 (1972)).  Five factors should be considered in determining the reliability of

identification evidence:

> 1. the witness's opportunity to view the criminal at the time of the
> crime;
> 2. the witness's degree of attention at the time of the crime;
> 3. the accuracy of the witness's prior description of the defendant;
> 4. the witness's level of certainty when identifying the suspect at the
> confrontation; and,
> 5. the length of time that has elapsed between the time and the
> confrontation.
>
> *Neil v. Biggers,* 409 U.S. at 199-200; *United States v. Gatewood*, 184 F.

3d 550, 556 (6th Cir. 1999).

If a defendant fails to show that the identification procedures are

impermissibly suggestive, or if the totality of the circumstances indicate that the

identification is otherwise reliable, no due process violation has occurred; so

long as there is not a substantial misidentification, it is for the jury or factfinder to

determine the ultimate weight to be given to the identification. *See United States*

*v. Hill*, 967 F. 2d 226, 230 (6th Cir. 1992); *Johnson v. Warren,* 344 F. Supp. 2d

1081, 1090 (E.D. Mich. 2004).

In this case, assuming that the pre-trial identification procedures were

unduly suggestive, petitioner has failed to show, under the totality of circumstances, that the suggestiveness led to a substantial likelihood of an irreparable misidentification.  Mr. Yang testified that there was adequate lighting by his house.  Yang testified that he was face to face with petitioner from one foot away and was able to focus on his eyes.  Moreover, the length of time between the robbery and the challenged identifications was short and Yang never identified anyone else as being his assailant.  These factors all support the trial court's finding that an independent basis existed for Yang's in-court identification of petitioner. *See Robertson v. Abramajtys,* 144 F. Supp. 2d 829, 847 (E.D.Mich. 2001.)  The mere fact that Yang looked at petitioner for only thirteen to fifteen seconds would not render his in-court identification unreliable, in light of the fact that Yang was able to get an unobstructed view of petitioner and identified him with a high degree of certainty at the photographic show-up the day after the robbery, at the preliminary examination two weeks after the robbery, and subsequently at trial. *See Brown v. Tracy,* 299 F. Supp. 2d 77, 80 (E.D.N.Y. 2004)(state court's determination that robbery victim's in-court identification of petitioner was reliable, despite suggestive identification procedures, was not contrary to, and did not represent an unreasonable application of clearly established federal law, where the victim had an unobstructed, well-illuminated view of his assailant during a robbery that lasted for approximately 15 seconds, and the victim identified the petitioner as the

assailant with a high degree of certainty two months after the robbery).

Moreover, with respect to Yang's attentiveness to the situation, courts tend to "place greater trust in witness identifications made during the commission of a crime because the witness has a reason to pay attention to the perpetrator." *Howard v. Bouchard,* 405 F. 3d 459, 473 (6th Cir. 2005); *cert. den.* 126 S. Ct. 1032 (2006); *See also United States v. Meyer*, 359 F. 3d 820, 826 (6th Cir. 2004) (finding heightened degree of attention where witness spoke with robber and studied his features while looking for an opportunity to escape); *United States v. Crozier*, 259 F.3d 503, 511 (6th Cir. 2001)(finding heightened degree of attention where robber confronted witnesses with a gun).  In light of the fact that Yang was being robbed at gunpoint, it was not unreasonable for the state courts to conclude that Yang paid a high degree of attention to his assailant.

Moreover, even if there were slight discrepancies between Yang's initial description of his assailant and petitioner's appearance, this would be insufficient to render the in-court identification suspect, in light of the fact that Yang was able to get a good look at petitioner and testified that he was certain in his identification of petitioner as being the suspect. *See United States v. Hill,* 967 F. 2d at 232-33 (in-court identification of alleged bank robber held admissible despite five years between incident and trial and slight inaccuracies in witness' description of robber, where witness' view of robber was brightly lit and

unobstructed and she showed high degree of certainty in her in-court

identification).

Finally, the reliability of Yang's in-court identification is supported by the

fact that he "testified without equivocation" that petitioner was his assailant.

*Howard,* 405 F. 3d at 473.

In addition to considering the reliability of the actual identification, courts

also look to other evidence to determine whether, if the identification was tainted,

permitting the identification was an error of sufficient magnitude to rise to a

constitutional level because of a very substantial likelihood of irreparable

misidentification, or whether the error was harmless. *Robertson,* 144 F. Supp. 2d

at 848.

Given all of the evidence against petitioner, namely, the fact that he was

caught by the police near the crime scene soon after the robbery in a car which

resembled the vehicle that the robber fled the scene in, that a mask was found in

his possession at the time of his arrest, that he was wearing the same clothing

as Yang's assailant, and his positive identification by Parker, any error in

admission of Yang's allegedly unreliable identification testimony was harmless

error at best. *See Solomon v. Curtis,* 21 Fed. Appx. 360, 363 (6th Cir. 2001); *See

also Williams v. Stewart,* 441 F. 3d 1030, 1039 (9th Cir. 2006); *cert. den. sub nom

Williams v. Schriro,* ---- S. Ct.----; 2006 WL 2540769 (U.S. October 30,

2006)(strong circumstantial evidence linking petitioner to crime scene rendered

13

admission of pre-trial identification harmless); *Flaherty v. Vinzant,* 386 F. Supp.

1170, 1175 (D. Mass. 1974)(admission of suggestive identification harmless

error at best where petitioner had handkerchief folded in the shape of a mask in

his pocket at the time of his arrest).

In this case, the Michigan Court of Appeals' decision that the totality of

factors weighing towards a finding of an independent basis for the in-court

identification outweighed the few factors weighing against a finding of an

independent source was not an unreasonable application of clearly established

federal law.  Accordingly, petitioner is not entitled to habeas relief on this claim.

*See Robertson,* 144 F. Supp. 2d at 847-48.

**B.  Claim # 2.  The destruction of evidence claim.**

In his second claim, petitioner contends that his right to a fair trial was

violated when the police failed to preserve his car as evidence for trial.

To the extent that petitioner is claiming that the prosecutor violated state

discovery rules, he would not be entitled to habeas relief.  A claim that a

prosecutor violated state discovery rules is not cognizable in federal habeas

review, because it is not a constitutional violation. *See Lorraine v. Coyle,* 291 F.

3d 416, 441 (6th Cir. 2002); *See also Friday v. Straub,* 175 F. Supp. 2d 933, 940

(E.D. Mich. 2001).

To the extent that petitioner is raising a due process claim, he is also not

entitled to relief.  The failure of police to preserve potentially useful evidence for

a defendant is not a denial of due process of law unless the defendant can show

bad faith on the part of police. *Arizona v. Youngblood*, 488 U.S. 51, 57-58

(1988).  When the state fails to preserve evidentiary material "of which no more

can be said than that it could have been subjected to tests, the results of which

might have exonerated the defendant," a defendant must show: (1) that the

government acted in bad faith in failing to preserve the evidence; (2) that the

exculpatory value of the evidence was apparent before its destruction; and (3)

that the nature of the evidence was such that the defendant would be unable to

obtain comparable evidence by other means. *Monzo v. Edwards,* 281 F. 3d 568,

580 (6th Cir. 2002).  A habeas petitioner has the burden of establishing that the

police acted in bad faith in failing to preserve potentially exculpatory evidence.

*Malcum v. Burt,* 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003)(internal citations

omitted).  The mere fact that the police had control over evidence and failed to

preserve it is insufficient, by itself, to establish bad faith, nor will bad faith be

found in the government's negligent failure to preserve potentially exculpatory

evidence. *Id.*  "The presence of absence of bad faith by the police for purposes

of the Due Process Clause must necessarily turn on the police's knowledge of

the exculpatory value of the evidence at the time it was lost or destroyed."

*Youngblood,* 488 U.S. at 56, n.

Petitioner's claim fails because he has failed to show that the police acted

in bad faith in failing to preserve his car for trial. *Malcum,* 276 F. Supp. 2d at 683.

The mere fact that the police may have been negligent, or even grossly negligent, in permitting petitioner's car to be sold, is insufficient to show that they acted in bad faith. *Monzo,* 281 F. 3d 580.  In this case, there is no showing of bad faith, in light of the fact that there is no evidence that the police knew or intended for petitioner's car to be sold by the storage lot. *See United States v. Estrada,* 453 F. 3d 1206, 1213 (9th Cir. 2006).

Secondly, it is uncertain whether the evidentiary value of petitioner's car was destroyed or lost at all, in light of the fact that petitioner's counsel did not appear to have made any effort to track down or contact the new owner, even though petitioner was given the name and address of the new owner. *Estrada,* 453 F. 3d at 1212.

More importantly, petitioner has presented no evidence to show that the police knew that this evidence was potentially exculpatory when they failed to preserve his car.  Petitioner's conclusory allegations regarding the alleged destruction of potentially exculpatory material fail to establish that the police, in bad faith, destroyed any evidence with knowledge of its exculpatory value. *See Malcum,* 276 F. Supp. 2d at 683.

Lastly, as the Michigan Court of Appeals indicated in its opinion, there was ample police testimony regarding the inability to open the trunk of the car in the manner described by Christon, who testified that he saw petitioner place the gun

16

in the trunk of the car.  In light of the ample evidence produced which called into question this part of Christon's testimony, petitioner's actual car would have been cumulative evidence.  Therefore, the sale of petitioner's car did not justify dismissal of the charges against him. *See e.g. United States v. Diaz,* 675 F. Supp. 1382, 1389 (E.D.N.Y. 1987).  Peitioner is not entitled to habeas relief on his second claim.

### C.  Claim # 3.  The jury instruction claim.

Petitioner lastly contends that the trial court erred in refusing to instruct the jury that because the police failed to produce his car for trial, the jury could infer that this evidence would have been favorable to petitioner and unfavorable to the prosecution.  The Michigan Court of Appeals rejected petitioner's claim, in part because he failed to show that the police acted in bad faith in failing to preserve his car for trial. *People v. Young,* Slip. Op. at * 3.

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal.  The question in such a collateral proceeding is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned", and an omission or incomplete instruction is less likely

to be prejudicial than a misstatement of the law. *Henderson v. Kibbee*, 431 U.S. 145, 154-155 (1977).

Under Michigan law, petitioner would only be entitled to have the jury instructed that it could infer that the destroyed, potentially exculpatory evidence would have been favorable to the defendant if the trial court judge first determined that the police or prosecutor acted in bad faith in destroying the evidence. *See People v. Cress,* 466 Mich. 883; 646 N.W. 2d 469 (2002); *See also People v. People v. Oliver,* No. 2005 WL 3115861, * 2 (Mich. Ct. App. November 22, 2005)(adverse inference instruction is appropriate where the prosecutor acted in bad faith).  Because petitioner has failed to establish that the police acted in bad faith in failing to preserve his car for trial, he would not be entitled to habeas relief on his claim that the trial court failed to give the jury an instruction regarding the failure of the police to preserve this evidence for trial. *See Farmer v. Iowa,* 153 F.Supp.2d 1034, 1042 (N.D. Iowa 2001).  Petitioner is not entitled to habeas relief on his final claim.

## IV.  Conclusion

The Court will deny the petition for writ of habeas corpus.  The Court will also deny a certificate of appealability to petitioner.  In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this

denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.*  A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right.  Jurists of reason would not find this Court's resolution of petitioner's claims to be debatable or that they should receive encouragement to proceed further. *Myers v. Straub,* 159 F. Supp. 2d 621, 629 (E.D. Mich. 2001).  The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *Id.*

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the Petition for a Writ of Habeas Corpus is **DISMISSED WITH PREJUDICE.**

19

IT IS FURTHER ORDERED That a Certificate of Appealability is **DENIED.**

IT IS FURTHER ORDERED that petitioner will be **DENIED** leave to appeal

*in forma pauperis.*

Dated:  November 21, 2006

S/George Caram Steeh

GEORGE CARAM STEEH

UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
November 21, 2006, by electronic and/or ordinary mail.

S/Josephine Chaffee

Deputy Clerk